Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Al filo de los treinta años de la trascendental decisión en Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978), emitida *379 por voz del Juez Presidente Trías Monge, una mayoría de este Tribunal le da su espalda a lo que ha sido nuestra tradición vindicadora de la intimidad personal, con su empañada visión del alcance de lo allí dispuesto. Con una mirada de corto aliento, la Mayoría sostiene que no hay cabida en nuestro ordenamiento para reconocer la ruptura irreparable como una causal disponible para dar por terminado un matrimonio que ha dejado de existir conforme a la voluntad de una de las partes.
La opinión mayoritaria determina que en Figueroa Ferrer no se reconoció dicha causal como separada de la causal de consentimiento mutuo, y que permitirla como causal adversativa derrotaría el derecho a la intimidad que allí se intentó salvaguardar. La mayoría enfoca sus miras en qué se dijo o no se dijo en Figueroa Ferrer, congelando en el tiempo el derecho a la intimidad. Treinta años no pasan en vano. En los albores del siglo XXI y conforme los desarrollos doctrinales en materia del derecho a la intimidad, la respuesta que ofrece este Tribunal a la controversia de marras acusa, como poco, falta de actualidad.
Con el respeto que siempre me merece el criterio de mis colegas, lamento el retroceso que representa la opinión que hoy anuncian. Expreso entonces con profunda convicción, mi enérgico disentimiento con el curso trazado.(1)
I
A. La raíz del desacierto de la opinión del Tribunal reside en su renuencia a reconocer cuál es el verdadero alcance del derecho a la intimidad que establece nuestra Norma Fundamental. La visión unidimensional de este derecho que refleja la opinión de la mayoría conduce al errado resultado a que llega.
*380 En innumerables ocasiones nos hemos expresado sobre la importancia que para el libre desarrollo de la persona revisten el derecho a la intimidad y la inviolabilidad de la dignidad humana. Hemos concebido el derecho a la intimidad como “componente del derecho a la personalidad, [que] goza de la más alta protección bajo nuestra Constitución y constituye un ámbito exento capaz de impedir y limitar la intervención de terceros —sean particulares o poderes públicos— contra la voluntad del titular”. López Tristani v. Maldonado, 168 D.P.R. 838, 849 (2006). Es un derecho de índole subjetivo e inherente al ser humano, que no puede, en ningún caso, ser cerrado o estático. P.R. Tel. Co. v. Martínez, 114 D.P.R. 328 (1983). Se configura, en su esencia, como protección de la autorrealización del individuo.(2) La intimidad es el origen de la diversidad, de la diferenciación y de la pluralidad, por lo que es garantía de democracia y pluralismo. Es, como ha dicho el profesor Rebollo Delgado, “un ejercicio constante de liberalidades”. L. Rebollo Delgado, El Derecho Fundamental a la Intimidad, 2da ed., Madrid, Dykinson, S.L., 2005, pág. 119.
Nuestra vasta jurisprudencia sobre el derecho a la intimidad puede reconducirse sin dificultad a uno de dos paradigmas: la intimidad territorial y la intimidad informacional. La primera de éstas “protege espacios o zonas de aislamiento frente a la intrusión de extraños, un *381 ‘área espacial o funcional de la persona’ L.J. Mieres Mieres, Intimidad, personal y familiar: prontuario de jurisprudencia constitucional, Navarra, Ed. Aranzadi, 2002, pág. 25. La intimidad informacional, por su parte, “tiene por objeto las informaciones relativas a la vida privada de las personas”. Id. Son estas dos dimensiones las que mayormente se reflejan en nuestras decisiones.(3)
Existe una tercera dimensión del derecho a la intimidad sobre la cual no hemos abundado en demasía en el pasado. Esta consiste en la intimidad como autonomía en la adopción de decisiones personales. López Vives v. Policía de P.R., 118 D.P.R. 219, 242 (1987), opinión concurrente de la Juez Asociada Señora Naveira Merly. Véase Mieres Mieres, op. cit., págs. 29-33. Como su propio enunciado sugiere, esta vertiente comporta, necesariamente, el reconocimiento de la libertad individual para la elección y el desarrollo del propio plan de vida.(4) Véase M. Galán Juárez, Intimidad nuevas dimensiones de un viejo derecho, Madrid, Editorial Universitaria Ramón Areces, 2004, pág. 130 (“la intimidad ... es el marco adecuado para que el hombre se encuentre a sí mismo, decida por sí y desarrolle por tanto su autonomía ... [E]s esa ‘esfera personal reconocida’ que tendría que aceptar todo liberal como punto de partida para la adopción de decisiones sociales”). El derecho a tomar decisiones importantes sobre la vida íntima o familiar de las personas se configura como mecanismo de desarrollo de la personalidad.(5) Rebollo Delgado, op. cit., *382 págs. 121-123. Véase, además, López Vives v. Policía de P.R., supra. Recordemos además, que bajo nuestro orden constitucional la vida privada o familiar goza de protección.(6) Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1.
En nuestro ordenamiento, las relaciones de familia las hemos analizado en el contexto del derecho a la intimidad. Rexach v. Ramírez, 162 D.P.R. 130 (2004). Necesariamente entonces, la decisión de contraer matrimonio se instaura como reflejo individualizado de la dimensión de autonomía del derecho a la intimidad. “La toma de esta decisión, con quién hacerlo y cuándo, es un asunto eminentemente personal e íntimo que no debe estar sujeto a intervenciones o coerciones indebidas, salvo que medie un interés de gran preeminencia que así lo justifique.” Gralau v. Latorre, 163 D.P.R. 423, 428 (2004), voto concurrente de la Juez Asociada Señora Rodríguez Rodríguez. Consiguientemente, la “doctrina es unánime respecto a la singular trascendencia del derecho a contraer matrimonio tanto en su vertiente positiva como negativa, catalogándolo sin duda como un derecho humano de singular trascendencia”. F. Herrero-Tejedor, La intimidad como derecho fundamental, Madrid, Ed. Colex, 1998, pág. 17.
B. Como sabemos, la Constitución de Estados Unidos no reconoce expresamente —como es el caso de la Constitución del Estado Libre Asociado— el derecho a la *383 intimidad. Pero sí ha reconocido que una dimensión del derecho a la libertad de la Decimocuarta Enmienda incluye un área de intimidad personal o individual, al igual que una garantía de la existencia de zonas de intimidad. Véanse: Roe v. Wade, 410 U.S. 113, 152 (1973) (“a right of personal privacy or a guarantee of certain areas or zones of privacy”); E. Chemerisky, Constitutional Law, Principles and Policies, 2da ed., Nueva York, Aspen Publishers, 2002, Sec. 10.1.1, págs. 762-763.
Este derecho a la “intimidad personal” incluye, entre otros asuntos, la toma de decisiones importantes sobre la vida de una persona; una de las cuales es la determinación de contraer matrimonio. A modo de ejemplo, en Loving v. Virginia, 388 U.S. 1, 12 (1967), el Tribunal Supremo de Estados Unidos determinó que la decisión de casarse está contenida en el concepto de libertad de la cláusula de debido proceso de ley y declaró inconstitucional un estatuto del estado de Virginia que proscribía el matrimonio interracial. Explicó que el matrimonio es uno de los derechos civiles básicos del ser humano, fundamental para nuestra propia existencia, por lo que negarlo a base de clasificaciones de índole raciales infringe la libertad de los ciudadanos sin el debido proceso de ley. Bajo este análisis se ha determinado que, ínsito al concepto de libertad se encuentra también el derecho a establecer un hogar y a procrear hijos. Meyer v. Nebraska, 262 U.S. 390 (1923); Skinner v. Oklahoma, 316 U.S. 535 (1942); Zablocki v. Redhail, 434 U.S. 374 (1978).
Por otro lado, en Griswold v. Connecticut, 381 U.S. 479 (1965), el Tribunal sostuvo que violaba el derecho a la intimidad que circunda las relaciones maritales una ley que prohibía el uso y distribución de métodos anticonceptivos. El Tribunal razonó que el derecho a la intimidad no permitía la intromisión del Estado en el lecho matrimonial en busca de evidencia sobre la utilización de métodos anticonceptivos.
Así, de acuerdo con la jurisprudencia del Tribunal Supremo de Estados Unidos, el derecho al matrimonio in *384 cluye la libertad de tomar decisiones relacionadas al matrimonio. Carey v. Population Services International, 431 U.S. 678, 685 (1977). Siendo ello así, forzoso es concluir que goza de protección constitucional no tan sólo esa decisión —la de contraer matrimonio— sino también todas aquellas decisiones que giren alrededor del matrimonio, como la de disolverlo. Véase Boddie v. Connecticut, 401 U.S. 371, 383 (1971) (“a State may not, consistent with the obligations imposed on it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve [a marriage] without affording all citizens access to the means it has prescribed for doing so”). Véanse: United States v. Kras, 409 U.S. 434 (1973); Chemerinsky, op. cit., Sec. 10.9, pág. 882 (“divorces relate to the constitutional right to marry, a person only could exercise that right if he or she received a divorce from an existing spouse”). Véase, además, Horowitz, The “Holey” Bonds of Matrimony: A Constitutional Challenge to Burdensome Divorce Laws, 8 U. Pa. J. Const. L. 877, 881 (2006).
Conviene apuntar que en Roberts v. United States Jaycees, 468 U.S. 609, 618-620 (1984), se dispuso que el reconocimiento de una zona de intimidad que cobije las relaciones familiares obedece a que éstas desempeñan un rol social determinante. Es allí donde se cultiva y se diseminan los ideales y valores preciados de la sociedad, fomentando así la diversidad cultural y social necesaria para el desarrollo y crecimiento de una sociedad liberal, democrática y pluralista. El Estado debe abstenerse de intervenir en la esfera familiar pues es allí donde los individuos desarrollan su identidad, elemento esencial de la libertad.
Somos del criterio que el matrimonio no es sólo una institución social, cuya estabilidad interesa a la sociedad, sino también, y sobre todo, “un cauce al servicio del libre desarrollo de la personalidad de los contrayentes, que, mediante la opción de casarse, expresan, como seres humanos libres y responsables, una decisión íntima, a través de la cual encauzan su existencia”. J.R. De Verda y Belmonte, La personalización del matrimonio en las reformas de 2005 *385 en J.R. De Verda y Belmonte, Comentarios a las reformas de derecho de familia de 2005, Navarra, Ed. Aranzadi, 2006, pág. 18. Esta es una decisión que entronca, como ya dijimos, en la esfera de autonomía del derecho a la intimidad. Así también debe ser cuando de lo que se trate sea de la voluntad expresa de una persona que ya no desea continuar vinculada a su cónyuge. Una y otra constituyen expresiones sobre el libre desarrollo de la personalidad de cada cual, exigencia de libertad y dignidad del ser humano, cuyo epicentro reside en el derecho a la intimidad en la modalidad que valora la toma de decisiones sobre la vida íntima del ser humano. Ambas decisiones gozan necesariamente de protección bajo la Constitución del Estado Libre Asociado de Puerto Rico.
Pasemos ahora a analizar el modelo establecido en Figueroa Ferrer.
II
A poco que analicemos con rigor doctrinal la decisión en Figueroa Ferrer, nos percatamos que en ésta se incorporan dos estamentos del derecho a la intimidad como base fundacional para la determinación que se anunciaba. Por un lado, el derecho a tomar decisiones importantes sobre la vida íntima o familiar que se manifiesta cuando el individuo determina divorciarse y, por otro lado, el derecho a la intimidad que cobija la información sobre la vida íntima de los cónyuges.
En Figueroa Ferrer reconocimos que el Estado no puede limitar el divorcio a causales derivadas del concepto de la culpa, pues ello violaría el derecho a la intimidad en su modalidad de autonomía personal, en cuyo caso era imperativo reconocer la causal de consentimiento mutuo como causal no culposa. Sobre este asunto, la opinión expresó que “[l]as Secs. 1 y 8 del Art. II de la Constitución no permiten limitar los fundamentos del divorcio en Puerto Rico dentro de las circunstancias de este caso a causales derivadas de la culpa. ... La esencia del derecho estriba en la *386 abolición de la noción de culpa”. (Énfasis nuestro.) Figueroa Ferrer, pág. 276. Claramente, el tribunal tiene que reconocer la causal no culposa de consentimiento mutuo, pues requerir causales culposas violaría el derecho a la intimidad en su vertiente de autonomía personal al supeditar la obtención de un divorcio a la comisión por uno de los cónyuges de alguna de las actuaciones culposas establecidas por ley.(7)
Dicho de otra forma, en Figueroa Ferrer establecimos que el derecho a la intimidad en Puerto Rico cobija la decisión de divorciarse. Consiguientemente, deshecho el vínculo matrimonial, no existe ningún interés apremiante que le permita al Estado imponer onerosas cargas a esa decisión. A esos efectos, expresamos en la opinión: “el Estado está impedido ... de obligar a dos seres humanos a permanecer atados .... ¿Qué interés público existe en mantener un vínculo irremediablemente deshecho?” Figueroa Ferrer, pág. 275. En esa ocasión la carga coercitiva consistía en que la única forma en que una persona podía divorciarse era si el otro cónyuge incurría en conducta culposa.(8)
Una vez reconocimos en Figueroa Ferrer la causal de *387 consentimiento mutuo, establecimos que en estos casos las partes “[n]o necesitan ... expresar las razones de su decisión si a su juicio ello conlleva la revelación indeseada de penosos detalles de su vida íntima”. íd., pág. 276. El mutuo acuerdo de divorciarse, junto con las estipulaciones requeridas en esos casos, es prueba suficiente para que el tribunal reconozca que los vínculos matrimoniales han quedado rotos. Reclamar que los cónyuges abunden sobre las razones de su decisión no tiene ningún propósito legítimo, por lo que dicha exigencia violaría el derecho a la intimidad de los cónyuges, en su modalidad de intimidad sobre la información personal.
Lamentablemente, la opinión que hoy dicta una mayoría de los componentes de este Tribunal, no parece comprender la sutileza que supone el reconocimiento de la modalidad del derecho a la intimidad de autonomía en la adopción de decisiones íntimas o personales, que con tanto cuidado se elaboró en Figueroa Ferrer. En el contexto de este paradigma, es de todo punto inadmisible descalificar la causal de ruptura irreparable para dar por terminado el vínculo matrimonial. Ello es secuela necesaria de la autonomía en la adopción de decisiones íntimas. En última instancia, de lo que se habla es de reforzar el principio de libertad de los cónyuges en el matrimonio, pues tanto la continuación de su convivencia como su vigencia, depende de la voluntad constante de cada cual.
La mayoría circunscribe su análisis a si en Figueroa Ferrer se reconoció o no la causal de ruptura irreparable. Lo cierto es que, en puridad, si allí se reconoció o no, es, a fin de cuentas, irrelevante. Lo importante no es si la causal de ruptura irreparable encuentra cabida en Figueroa Ferrer, sino si la encuentra en el derecho a la intimidad a partir de Figueroa Ferrer. La respuesta obvia es que sí.
III
A. Iniciamos nuestra discusión sobre la validez de la causal de ruptura irreparable recordando nuestras expre *388 siones en García Santiago v. Acosta, 104 D.P.R. 321, 324 (1975), las que nos sirven de trasfondo doctrinal para encauzar la discusión:
En la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con sensitivas urdimbres emocionales como lo son las relaciones de familia. La intromisión en la vida privada sólo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad públicas o el derecho a la vida y a la felicidad del ser humano afectado.
Construyendo sobre lo expresado, en Figueroa Ferrer, pág. 275, señalamos que aunque el Estado tiene la responsabilidad de velar por la estabilidad de la familia, la guarda y el cuidado de los hijos, la justa división de los bienes gananciales y la adecuada protección de las partes que interesen disolver su vínculo matrimonial, está impedido no obstante, de irrumpir en tales aspectos que son eminentemente personales, salvo que exista un interés apremiante que lo justifique. Véase, también, Rosario v. Galarza, 83 D.P.R. 167, 174 (1961).
Pasemos a analizar propiamente la controversia de marras.
B. Un matrimonio está roto irreparablemente cuando por cualquier causa, no importa por motivo de quién se origina, la relación conyugal ha perdido su razón de ser, es decir, han desaparecido los nexos de convivencia matrimonial sin que exista la posibilidad de que prospere una reconciliación. Nada más se requiere. Esta causal no es de carácter culposa, y su elemento esencial es precisamente esa ruptura del vínculo matrimonial sin la posibilidad de reconciliación. Véase, en general, R.E. Ortega Vélez, Mujer, historia y derecho: el proceso de divorcio, San Juan, Ediciones Situm, 1997, págs. 180-181.(9)
*389 La inadmisión de esta causal para disolver un matrimonio, como establece hoy una mayoría de este Tribunal, viola el derecho a la intimidad de los cónyuges en la modalidad de la autonomía en la toma de decisiones íntimas y de trascendencia de la persona. Obliga al cónyuge que ha concluido que se ha roto irreparablemente su vínculo matrimonial a permanecer atrapado en un matrimonio no deseado.
Lo cierto es que, conforme resolvimos en Figueroa Ferrer, una vez el vínculo matrimonial está irremediable deshecho, no existe interés público del Estado que exija, para su protección, la imposición de cargas onerosas sobre la intimidad de los individuos. Aquí la carga, por demás onerosa, es que se condiciona el divorcio a la existencia de una causal culposa, sobre la cual el cónyuge que desea divorciarse no tiene control; lo que ya rechazamos en Figueroa Ferrer. Sorprendentemente, el Tribunal no intenta siquiera explicar por qué en esta ocasión tal exigencia es válida, cuando no lo fue antes. Por otra parte, obliga a ese cónyuge, en ausencia de la causal culposa, a procurar la anuencia del otro para divorciarse utilizando como causal el consentimiento mutuo, supeditando el ejercicio de su libertad a la voluntad de otro a quien ya no le unen lazos afectivos. Vemos entonces cómo bajo ambos supuestos, el ejercicio de la libertad del individuo se sujeta y condiciona a la voluntad de su otro cónyuge.(10)
Además, al reconocer la causal de ruptura irreparable relevamos a las partes del requisito de liquidar la Sociedad Legal de Gananciales como condición para acceder al divorcio, tal y como lo impusimos para el divorcio bajo la causal *390 de consentimiento mutuo.(11) Huelga una expresión sobre la dificultad y aflicción que conlleva el divorcio para los cónyuges, aun cuando éstos así lo deseen. Rodear ese proceso con el requisito de que se tienen que poner de acuerdo sobre la distribución de los haberes de la sociedad, es imponer cargas emocionales adicionales sobre los cónyuges que se traducen, en demasiadas ocasiones, en la semilla que germina en nuevas discordias y litigios.
Estas estipulaciones se han convertido en “una de las áreas más problemáticas en la administración de la Justicia en Puerto Rico por razón del gran número de asuntos que genera ante los tribunales”. Valencia, Ex parte, 116 D.P.R. 909, 910 (1986). Así lo demuestra la experiencia de los últimos años. E.g.: Rivera Rodríguez v. Rivera Reyes, 168 D.P.R. 193 (2006); Náter v. Ramos, 162 D.P.R. 616 (2004); McConnell v. Palau, 161 D.P.R. 734 (2004); Igaravidez v. Ricci, 147 D.P.R. 1 (1998); Magee v. Alberro, 126 D.P.R. 228 (1990); Negrón Rivera y Bonilla, Ex parte, 120 D.P.R. 61 (1987). Ello no nos debe sorprender porque, como indicamos en Náter v. Ramos, supra, pág. 630, con gran atino, “los acuerdos pueden estar motivados por la carga emocional involucrada en lograr la pronta disolución del matrimonio o la ventaja económica o intelectual que uno de los cónyuges tenga sobre el otro”.
Advertimos finalmente, que en nuestro ordenamiento la única forma en que los individuos pueden obtener un divorcio es mediante un procedimiento judicial. El Estado no puede entonces, negarle a un cónyuge el acceso al procedimiento judicial sin articular algún interés apremiante, pues se trata de vindicar el derecho a la intimidad en su dimensión de autonomía.(12) La mayoría en su opinión no *391 articula con ningún rigor cuál es ese interés apremiante.(13) La ausencia de la causal de ruptura irreparable niega el acceso al tribunal y evita el ejercicio del derecho a la intimidad, lo que es claramente inconstitucional.
Cierro como comencé, expresando mi profunda decepción con el proceder de una mayoría de los integrantes de esta Curia. Hoy, este Tribunal, a la usanza de Dred Scott y Korematsu, escribe una de sus más tristes páginas. Le recuerdo a la Mayoría, que los derechos no son graciosas concesiones sino conquistas de libertad.
*392 Por las razones que expreso, disiento enérgicamente del proceder mayoritario; por contra, resolvería que la causal de ruptura irreparable está disponible para obtener un divorcio en Puerto Rico, sin mayor exigencia que la voluntad expresa de uno de los cónyuges.

 Tenía razón Oriana Fallad cuando nos advertía que “hay momentos de la vida en que callar se convierte en una culpa. Hablar, en una obligación. Un deber civil, un desafío moral, un imperativo categórico del cual no te puedes evadir”. O. Fallad, La rabia y el orgullo, 7ma ed., Madrid, La Esfera de los Libros, 2002, pág. 14. Este es uno de esos momentos.

 Aquí debemos rechazar la valoración que hace la opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri, respecto el derecho a la intimidad y como éste se desvanece cuando dos personas contraen matrimonio. Primeramente, cabe señalar que el derecho a la intimidad en cualquiera de sus vertientes es un derecho de carácter individual. Segundo, y tal vez más importante, es un derecho que no depende del estatus civil de la persona, sino que se ostenta en virtud de ser persona. No podemos avalar una tesis que postule que mediante la decisión de contraer matrimonio la persona renuncia a su derecho a la intimidad; resultado lógico de lo propuesto en dicha ponencia.
La visión adelantada en la opinión de conformidad nos recuerda la figura de la autoridad marital, desterrada de nuestro ordenamiento a partir de la reforma del derecho de familia de 1976. De la misma forma que previo a 1976, la mujer al contraer matrimonio perdía su individualidad para convertirse en un apéndice de su marido, la proposición adelantada en la ponencia pretende negarle vigencia al derecho a la intimidad •—manifestación de esa individualidad— por el hecho de haber contraído matrimonio. Según rechazamos lo primero, debemos rechazar el retroceso que supone lo segundo.

 Sobre la primera de estas dos vertientes llamada “intimidad territorial” confróntese, entre otros, López Tristani v. Maldonado, 168 D.P.R. 838 (2006); Pueblo v. Soto Soto, 168 D.P.R. 46 (2006); Nieves v. AM Contractors, 166 D.P.R. 399 (2005); Pueblo v. Camilo Meléndez, 148 D.P.R. 539, 550-552 (1999); Pueblo v. Meléndez Rodríguez, 136 D.P.R. 587, 597 (1994). Por otro lado, sobre la vertiente de información relativa a la vida privada véanse, entre otros: Rullán v. Fas Alzamora, 166 D.P.R. 742 (2006); Pueblo v. Loubriel, Suazo, 158 D.P.R. 371 (2003); Noriega v. Gobernador, 122 D.P.R. 650 (1988); Pueblo v. Torres Albertorio, 115 D.P.R. 128 (1984).

 Véanse: López v. E.L.A., 165 D.P.R. 280 (2005); Rexach v. Ramírez, 162 D.P.R. 130 (2004); Belk v. Martínez, 146 D.P.R. 215 (1998); Pueblo v. Duarte Mendoza, 109 D.P.R. 596 (1980).

 Hay quienes postulan que estas distinciones no son más que distintas caras de una misma moneda. Así, el profesor Martínez de Pisón Cavero indica: “En reali *382 dad, no es difícil percatarse de que son las dos caras de la misma moneda, el lado individual y el social de la privacy, y de que, en ocasiones, ambos aparecen sólidamente interconectados hasta en los escritos que más se escoran hacia uno u otro lado. ... ¿Acaso, en puridad, nuestras acciones y actividades sociales no son una manifestación, un reflejo de lo que sentimos como propio, de nuestro interior, como algo nuestro cuyas posibilidades de acceso de los demás controlamos estrictamente?” J. Martínez de Pisón Cavero, El derecho a la intimidad en la jurisprudencia constitucional, Madrid, Ed. Civitas, 1993, pág. 55.

 En Whalen v. Roe, 429 U.S. 589, 598-600 (1977), el Tribunal Supremo de Estados Unidos reconoció esta dimensión del derecho a la intimidad, al indicar lo siguiente:
“The cases sometimes characterized as protecting ‘privacy’ have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain hinds of important decisions.” (Enfasis nuestro.)

 Posteriormente, en el caso Torres, Ex parte, 118 D.P.R. 469 (1987), continua-mos contrayendo los efectos y la importancia de las causales culposas en los procesos de divorcio. Allí interpretamos el Art. 107 del Código Civil, el cual luego de ser enmendado por la Ley Núm. 100 de 2 de junio de 1976, dejó atrás el concepto de la culpa al momento de asignar la custodia de hijos menores. Resolvimos que la enmienda a dicho artículo, junto al reconocimiento del divorcio por consentimiento mutuo, hacen necesaria la figura de la custodia compartida entre ex cónyuges, independientemente de la determinación de culpa que se haya hecho en un proceso de divorcio. Véanse, además: J. De Witt Gregory, P. Swisher, S. Wolf, Understanding Family Law, 3era ed., New Jersey, Lexis Nexis, 2005, Cap. 8.01; L.D. Elrod & R.G. Spector, A Review of the Year in Family Law, 37 (Núm. 4) Fam. L.Q. 527, 578-580 (2004); Symposium on the America Law Institute’s Principles of the Law of Family Dissolution, 4 J.L. & Family Studies 1 (2002); Ellman, The Place of Fault in a Modern Divorce Law, 28 Ariz. St. L.J. 773, 807-808 (1996); H. Hill Flay, Equality and Difference: A Perspective on No-Fault Divorce and its Aftermath, 56 (Núm. 1) U. Cinn. L. Rev. 1 (1987).

 Ello no empece la causal de separación pues, como señalamos en Figueroa Ferrer v. E.L.A., 107 D.P.R. 250, 276 (1978), “[tampoco] puede forzarse a las partes a vivir ininterrumpidamente separados por dos años como único medio de ejercer su derecho a la intimidad y la inviolabilidad de su dignidad humana”.

 Véase W. González Almeyda, ¿Qué adelantamos con el retraso? (La ruptura irreparable como causal de divorcio), 41 (Núm. 2) Rev. Der. Pur. 315 (2002).

 Esto es precisamente lo que ha ocurrido en este caso donde la peticionaria no ha logrado acordar con el recurrido las estipulaciones necesarias para hacer viable un divorcio por consentimiento mutuo, y clama por un mecanismo que le permita conferirle actualidad legal a la realidad que vive: que su vínculo matrimonial ha dejado de existir. Este hecho, medular a la controversia ante nuestra consideración, ha sido omitido en la ponencia suscrita por la Mayoría.

 A nuestro juicio, queda por definirse la verdadera naturaleza del “acuerdo transaccional” sobre la liquidación de la sociedad legal de gananciales y las pensiones alimenticias que hemos impuesto para los casos de divorcio por consentimiento mutuo. Ello es así, en atención al peculiar contexto en que éste se origina que lo distingue de la transacción ordinaria.

 En relación con el planteamiento sobre el debido proceso de ley en su acepción procesal contenido en la opinión mayoritaria, éste es a todas luces improcedente. Como poco, la mayoría no expresa cuál es el derecho libertario o de propiedad que se *391 le priva a una persona reconociendo la causal de ruptura irreparable. La ausencia de tal derecho hace inaplicable el reclamo de debido proceso. No hay duda de que el Tribunal no ha sabido articular en qué consiste este mandato constitucional. Véanse: E. Chemerinsky, Constitutional Law Principles and Policies, 2da ed., Nueva York, Aspen Publishers, 2002, Sec. 7.2, pág. 527; 3 Rotunda and Nowak, Treatise Constitutional Law: Substance and Procedure Sec. 17.2, págs. 4-8 (1999).

 En un fallido intento de última hora, la Mayoría pretende solventar este vacío aseverando que “debe quedar claro que la protección de la unión matrimonial, en efecto, constituye un interés apremiante del Estado”. (Énfasis nuestro.) Opinión mayoritaria, pág. 344. Lo primero que llama la atención de tan aventurada aseveración en el contexto de este caso, es que la opinión que se cita en apoyo nada tiene que ver con lo planteado en la controversia que hoy nos toca resolver. Éllo ejemplifica la ausencia de rigor de la opinión que hoy suscribe la Mayoría.
Por otra parte, si fuéramos a considerar con seriedad el contenido y alcance de tal aseveración, habría que desterrar de nuestro ordenamiento legal el divorcio como apostasía de fe. En una sociedad donde la unión matrimonial constituye un interés apremiante del Estado, no puede haber cabida para el divorcio, la antinomia de esa unión. En estricto derecho, procedería que la mayoría declara inválida las otras causales o nos explicaran por qué son válidas frente a ese interés apremiante. Ciertamente, si evitar el divorcio gozara en realidad del cariz que pretende impartirle la mayoría, no podrían existir las causales que lo hacen viable, o sea, no existiría el divorcio.
Nuevamente, la Mayoría no ha sabido, o no ha querido, leer correctamente Figueroa Ferrer. En Figueroa Ferrer, pág. 275, establecimos que a nombre de la estabilidad de la familia, la guarda y cuidado de los hijos, la justa división de los bienes gananciales y la adecuada protección de las partes que disuelven su vínculo matrimonial, el Estado está impedido de obligar a dos seres humanos a permanecer atados cuando no lo desean. Dicho de otra forma, el Estado no puede utilizar ninguno de estos intereses apremiantes para evitar la disolución del matrimonio.
En vista de lo anterior y ante la imposibilidad de la Mayoría de identificar algún interés verdaderamente apremiante que justifique la intervención del Estado para negarle reconocimiento a la ruptura irreparable como causal viable para el divorcio, la opinión mayoritaria desoye a Figueroa Ferrer y se aventura a reconocer como valor apremiante la protección de la unión matrimonial per se. Para la Mayoría entonces es un interés apremiante evitar que las personas se divorcien. Nos parece lastimoso al igual deplorable que en su afán de justificar la decisión a la que se llega, se esboce tan obtusa e indocta normativa. Tal parecería que los integrantes de la Mayoría han quedado atrapados en una sociedad donde privan los valores decimonónicos y quieren a toda costa que les acompañemos. Rehúso darle marcha atrás al reloj.